IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 13, 2010 Session

## TONYA GAGER v. RIVER PARK HOSPITAL

**Appeal from the Circuit Court for Warren County**
**No. 2694      Larry B. Stanley, Jr., Judge**

---

**No. M2009-02165-COA-R3-CV - Filed October 26, 2010**

---

Plaintiff, a nurse practitioner formerly employed by a staffing service and supplied to a hospital emergency department, sued the hospital for retaliatory discharge under Tennessee common law and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304. The hospital moved for summary judgment, which the trial court granted. Finding no error, we affirm the judgment of the circuit court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

James L. Harris, Nashville, Tennessee, for the appellant, Tonya Gager.

C. Eric Stevens and Sarah Lodge Tally, Nashville, Tennessee, for the appellee, River Park Hospital.

**OPINION**

## I.  Facts & Procedural History[1]

Plaintiff, Tonya Gager ("Ms. Gager"), was employed by Southeastern Emergency Services, P.C. ("SES") as a nurse practitioner and was assigned to work in the Emergency Department of River Park Hospital, Inc. ("River Park" or "Defendant"). River Park staffed its emergency room through a contractual agreement with Southeastern Emergency Physicians, P.C. ("SEP"), an affiliate of SES. To fulfill its obligations to River Park, SEP contracted with SES to provide non-physician personnel for River Park's Emergency

---

[1]  The facts are taken from affidavits and other materials filed in support of or in opposition to Defendant's motion for summary judgment.  There is no dispute as to the facts stated.

Department. SES and SEP were collectively doing business as Team Health, Inc. ("Team Health").

On January 2, 2007, Christopher W. Dux, the former CEO of River Park ("former CEO"), sent a letter to all nurse practitioners in the River Park Emergency Department explaining a new hospital policy regarding patient-related communications by nurse practitioners.[2] Specifically, the CEO's letter set out River Park's requirement that nurse practitioners discuss a patient with an emergency department physician before discussing the patient with an attending or admitting physician.

Ms. Gager was concerned about the new policy, and on January 18, 2007, she and another nurse practitioner notified the Senior Vice President of Client Services for Team Health, regarding her concerns. On January 30, 2007, Ms. Gager's attorney sent a letter to Ernie Bacon, the interim CEO of River Park ("interim CEO") detailing her complaints about the effect of the new policy. On February 8, 2007, the Emergency Department Director of River Park was informed that Ms. Gager was not comfortable seeing patients under the new policy and that she had contacted Team Health about being assigned to another facility. On February 19, 2007, River Park's interim CEO sent an e-mail to the Senior Vice President of Client Services for Team Health requesting that Ms. Gager be assigned to another facility.[3] Thereafter, Ms. Gager was notified, by letter, of her termination from SES.[4]

---

[2] The letter stated, in pertinent part:

In response to repeated complaints received from our attending physicians and in light of the recent $7.5M lawsuit, nurse practitioners should NOT be calling the attending or admitting physician to discuss or present potential admissions to the facility. The hospital Board of Trustees has asked that I inform you of the following information in writing.

The nurse practitioner's role in the Emergency Department is to treat the _less severe patients_. Therefore, when a nurse practitioner sees a patient that has been triaged to the physician for care (chart in the physician's rack), the nurse practitioner _MUST_ discuss the care and treatment of that patient with the emergency room physician _prior to making any final disposition_.

(emphasis in original)

[3] The e-mail from the interim CEO to the Senior Vice President of Client Services for Team Health stated, "[A]s you are aware, Team Health . . . and River Park . . . have had several discussions recently relative to Tonya Gager, Nurse Practitioner. Accordingly, and relative to Article III, Section 2 of our agreement, this is to request that Tonya be assigned other than River Park."

[4] In Ms. Gager's responses to River Park's interrogatories she states:

(continued...)

On March 20, 2007, Ms. Gager filed a complaint against River Park and SES,[5] alleging breach of contract, gender discrimination, and retaliatory discharge; Ms. Gager sought $2,500,000.00 in damages. SES filed a motion for summary judgment, which the trial court granted; the court made the judgment final in accordance with Tenn. R. Civ. P. 54.02. Ms. Gager appealed the decision to this Court, which affirmed the trial court's judgment. *See Gager v. River Park Hosp. & Se. Emergency Servs., P.C.*, No. M2007-02470-COA-R3-CV, 2009 WL 112544 (Tenn. Ct. App. Jan. 13, 2009).

On June 4, 2008, River Park filed a motion for summary judgment on all claims. On July 17, 2008, the trial court granted partial summary judgment for River Park on the gender discrimination and breach of contract claims; however, the court denied the motion with regard to Plaintiff's claims of retaliatory discharge. In its order, the trial court specifically reserved for River Park the opportunity to seek summary judgment on the remaining claims after the completion of discovery.

On April 27, 2009, River Park filed a second motion for summary judgment on the claims of common law and statutory retaliatory discharge.[6] River Park filed exhibits, affidavits, interrogatories, pleadings, and a deposition in support of its contention that Ms. Gager could not establish the essential elements of her retaliatory discharge claims at trial. In response, Ms. Gager filed her affidavit and several exhibits. Following a hearing, the court granted summary judgment to River Park, finding that Ms. Gager was not an employee of River Park, but rather an independent contractor; that Ms. Gager failed to identify any "statute, common laws, regulations, or public policies that River Park's policy violated"; that Ms. Gager was not "acting to further an important public policy interest"; and that Ms. Gager "did not establish a retaliatory motive by River Park asking that she not return to work at [River Park's] emergency room." Ms. Gager thereafter filed a motion to alter, amend, set aside, or reconsider the summary judgment, which the trial court denied.

Ms. Gager timely appealed and raises the following issues:

---

[4](...continued)
12. Identify each and every person who allegedly informed you that you were 'being fired at the insistence of River Park.'

RESPONSE: The only notification I received about being fired came from TeamHealth in the form of a letter on my doorstep.

[5] The complaint originally named Team Health as a defendant, however SES was later substituted as a party.

[6] The basis of the statutory retaliatory discharge claim was Tenn. Code Ann. § 50-1-304.

I.    Did not the court err in holding that Ms. Gager was not an employee but rather an independent contractor for River Park Hospital or was an agent for River Park Hospital.

II.   Did not the court err in holding that Ms. Gager failed to identify any statutes, common laws, regulations, or public policies that River Park's policy violated.

III.  Did not the court err in holding that Ms. Gager was not acting to further an important public policy interest.  Further, that she did not complain to a single law enforcement agency or regulatory agency.

IV.   Did not the court err in holding that Ms. Gager did not establish a retaliatory motive by River Park asking that she not return to work at its emergency room.  Further, that the reason she was fired was because of a confrontation with a doctor and that she was unwilling to perform her job.

V.    Did not the court err in denying Ms. Gager's Rule 59 and 60, Tenn. R. Civ. P., Motion to Alter or Amend the Order granting summary judgment to River Park.

VI.   Did not the court err in failing to hold that Ms. Gager had a "reasonable belief" that what she complained about was illegal or against the public policy of Tennessee.

## II.  Standard of Review

This case has been appealed from the trial court's grant of summary judgment to Defendant.  A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *In re Estate of Davis*, 308 S.W.3d 832, 837 (Tenn. 2010); *Draper v. Westerfield*, 181 S.W.3d 283, 288 (Tenn. 2005).  Because summary judgment is a matter of law, we review the trial court's decision *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eskin v. Bartee*, 262 S.W.3d 727, 732 (Tenn. 2008); *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004); *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn. 2004).  In our review, we must consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 373 (Tenn. 2007); *Byrd v. Hall*, 847 S.W.2d 208, 210–11 (Tenn. 1993).

Summary judgment is appropriate where the moving party establishes, by a properly supported motion, that there is no genuine issue as to any material fact and that judgment may be rendered as a matter of law. *See* Tenn. R. Civ. P. 56.04; *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008). To show there is no genuine issue of material fact, a defendant moving party must either: "(1) affirmatively negat[e] an essential element of the nonmoving party's claim; or (2) show[] that the nonmoving party cannot prove an essential element of the claim at trial." *Martin*, 271 S.W.3d at 83 (citing *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8–9 (Tenn. 2008)). To meet this burden, the moving party must "either produce evidence or refer to evidence previously submitted by the nonmoving party that negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial." *Id*. at 84. In addition, a mere "assertion that the nonmoving party has no evidence" will not suffice. *Id.* (citing *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

If the moving party makes a "properly supported motion, then the nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist." *Id.* (citing *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215). This may be accomplished by:

> (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.0[7].

*Id.* (citing *McCarley*, 960 S.W.2d at 588; *accord Byrd*, 847 S.W.2d at 215 n.6). If the moving party does not satisfy the burden of production, the nonmoving party's burden to produce discovery materials or affidavits is not triggered, and the moving party's motion for summary judgment must be denied. *Hannan*, 270 S.W.3d at 5 (citing *Byrd*, 847 S.W.2d at 215). Consequently, summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, lead to the conclusion that the party seeking the summary judgment is entitled to judgment as a matter of law. *Green v. Green*, 293 S.W.3d 493, 514 (Tenn. 2009); *Blair,* 130 S.W.3d at 763.

## III. Analysis

Ms. Gager sued River Park for retaliatory discharge under Tennessee common law and the Tennessee Public Protection Act[7] ("TPPA"), Tenn. Code Ann. § 50-1-304. To receive summary judgment, River Park, as the moving party, had the burden to negate an essential element of Ms. Gager's claims of retaliatory discharge or to establish that Ms. Gager could not prove an essential element of the claims at trial. *See Mills v. CSX Transp., Inc.*, 300 S.W.3d 627, 631 (Tenn. 2009).

A plaintiff seeking to establish a claim for retaliatory discharge under Tennessee common law must prove the following:

(1) that an employment-at-will relationship existed;

(2) that the employee was discharged;

(3) the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and

(4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Gossett v. Tractor Supply* Co., No. M2007-02530-SC-R11-CV, 2010 WL 3633459, at *3 (Tenn. 2010) (citing *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002)). Similarly, to establish a claim of retaliatory discharge under the TPPA, Tenn. Code Ann. § 50-1-304, the Plaintiff must show the following four elements:

(1) The plaintiff's status as an employee of the defendant;

(2) The plaintiff's refusal to participate in, or to remain silent about, illegal activities;[8]

(3) The employer's discharge of the employee; and

---

[7] The TPPA, Tenn. Code Ann. § 50-1-304, is informally referred to as the "Tennessee Whistleblower Act." *See Burnett v. Am.'s Collectibles Network, Inc.*, No. 2009-00591-COA-R3-CV, 2010 WL 669246, at *6 (Tenn. Ct. App. Feb. 25, 2010).

[8] For purposes of the TPPA, "illegal activities" are defined as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(3).

(4)   An exclusive casual relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

*Hill v. Perrigo of Tennessee*, No. M2000-02-COA-R3-CV, 2001 WL 694479, at *3–4 (Tenn. Ct. App. 2001) (citations omitted); *see also Counce v. Accension Health*, No. M2009-00741-COA-R3-CV, 2010 WL 786001, at *4 (Tenn. Ct. App. 2010).

The existence of an employer-employee relationship is an essential element of both a statutory and common law claim for retaliatory discharge.  Consequently, Ms. Gager must establish that she was the employee of River Park to maintain her claims of retaliatory discharge.  As grounds for summary judgment, River Park contended there was no employer-employee relationship between itself and Ms. Gager; in support of its contention it relied upon, *inter alia*, the employment agreement between Ms. Gager and SES[9] and an email from the interim CEO of River Park to the Senior Vice President of Client Services at Team Health.

Ms. Gager's employment agreement with SES defines SES as "Employer" and identifies her duties as follows:  "Gager shall serve as a nurse practitioner and will perform all duties assigned by Employer at such times and Facilities designated by Employer."  In the agreement, she contracted to work not less than 156 hours per month and not more than 1,872 hours per year.  The agreement also establishes her annual salary and benefits[10] and obligates SES to provide professional liability insurance for "medical services rendered by Gager in satisfaction of Gager's obligations under this Agreement."   In addition, SES retained the power to terminate Ms. Gager: "[t]his agreement may be immediately terminated by Employer for cause upon the occurrence of any of the following: Gager's breach of this Agreement, Gager's loss of license, loss of privileges at a Facility by Gager, if a Facility requests that Gager not be scheduled to work at the Facility . . . ."

The email from River Park's interim CEO, requested that Ms. Gager be "assigned other than River Park."  In his affidavit, the interim CEO stated that, in sending the email he

---

[9] The employment agreement between Ms. Gager and SES was included as Exhibit 2 to River Park's first motion for summary judgment, which was incorporated into its second motion.

[10] With regard to benefits, the Agreement states: "Gager will be entitled to such employee benefits as Employer shall have in effect for its full-time employees as may be applicable."

was "exercis[ing] the hospital's rights under our contract with SEP[11] and inform[ing] Rita Eden of River Park's desire that Plaintiff be assigned somewhere other than at River Park." The interim CEO further explained that River Park "did not have the authority to direct termination of SES' employees" and that "[a]t all times relative to this lawsuit, River Park contracted with [SEP] to provide the necessary staff for its Emergency Room. River Park did not employ physicians or nurse practitioners in the ER." The "Emergency Department Services Agreement," which defined the relationship between River Park and SEP, provided that "[SEP] will, at its expense, contract with the physicians and an affiliated professional corporation employing the mid-level practitioners to render emergency medical services at [River Park]." The agreement further stated that nurse practitioners rendering services at River Park would do so "by and through contractual agreements between such nurse practitioners . . . and an affiliated professional corporation of [SEP]."[12]

Ms. Gager's employment agreement, SEP's agreement with River Park, and the affidavit and email of the interim CEO support River Park's assertion that it was not the employer of Ms. Gager,[13] thereby negating an essential element of Ms. Gager's claim and shifting the burden to her to establish a factual dispute as to her employment relationship with River Park. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008). She could do this by, among other things, pointing to overlooked evidence or introducing evidence establishing a material issue of fact for trial. *Id.*

In opposition to River Park's motion for summary judgment, Ms. Gager submitted an affidavit and several exhibits. The portions of her affidavit which address her claim that she was an employee of River Park are as follows:

---

[11] The "rights" to which the Interim CEO is referring are contained in section III (Removal of Physicians and Physician Extenders), paragraph 2 (For Cause) of the Emergency Department Services Agreement between SEP and River Park. The specific language of the agreement states, "Hospital may require the removal of a Physician or Physician Extender for cause upon five (5) days written notice upon reasonable notice. In the event Hospital requests that Contractor remove Physician or Physician Extender for cause, such request must be made in writing specifying the reaon(s) thereof."

[12] Presumably, SES was the "affiliated professional corporation of [SEP]" referred to in SEP's contract with River Park.

[13] Indeed, Ms. Gager's brief on appeal states:

While it is true that Tonya Gager was, technically, an employee of an entity other than River Park Hospital, the court's finding of fact did not take into consideration the undisputed facts leading inexorably to the conclusion that at all times pertinent, Ms. Gager was a constructive employee of River Park. She was a "loaned servant."

3. At all times pertinent I was employed as a nurse practitioner at River Park Hospital. By statute my position is the same as a Physician's Assistant in that we are considered mid-level providers.

. . .

16. Not only was I a "loaned servant" or employee of River Park, I was approved for a reappointment to the Medical Staff at River Park Hospital with privileges as Allied Health Professional-Emergency Medicine.

In support of her contention in paragraph 16, quoted above, Ms. Gager produced a letter from the former CEO of River Park dated December 1, 2006, informing her that the Board of Trust had approved her "reappointment to the Medical Staff at River Park Hospital with privileges as Allied Health Professional-Emergency Medicine." The reappointment period was December 1, 2006 through December 1, 2008. Included in the letter was a document styled "Physician Assistant and Nurse Practitioner Delineation of Privilege."

In reply, River Park pointed to its agreement with SEP which required all medical personnel, as a condition of their assignment in River Park's Emergency Department to "receive and maintain, staff membership and privileges in accordance with Hospital and Medical Staff bylaws . . . ." River Park contended that the letter from the interim CEO extending privileges to Ms. Gager was in accordance with River Park's contractual agreement with SEP, and was not an extension of an employment relationship to Ms. Gager.

On appeal, Ms. Gager contends that she was a "loaned servant" of River Park and that such status satisfies the employer-employee relationship element in her retaliatory discharge claims. While the question of whether Ms. Gager was the loaned servant of River Park would ordinarily be a question of fact for the jury, to the extent that Ms. Gager's relationship with SES, and River Park's relationship with SEP, is governed by contract, we address the issue as a matter of law. *See Parker v. Vanderbilt Univ.*, 767 S.W.2d 412, 417 (Tenn. Ct. App. 1989).[14]

_____

[14]　　　. . . whether a servant of one employer has become the servant of another is a question of fact. [citation omitted] Ordinarily, that determination would be for the jury. However, in this case, the relationship between the two hospitals is governed by a written agreement. The interpretation of an unambiguous written agreement is a question of law for the court. *Merritt v. Nationwide Warehouse Co.*, 605 S.W.2d 250, 255 (Tenn. Ct. App. 1980).

*Parker*, 767 S.W.2d at 417. Inasmuch as the loaned servant doctrine is based on the relationship between two employers, our focus is on the agreement between SEP and River Park.

The "loaned servant doctrine" is a principle of agency law in which a general employer "loans" his agent to a special employer, thereby giving the special employer control over the agent, along with responsibility for the agent's actions or omissions. *See* Restatement (Second) of Agency § 277 cmt. d (2010) ("If . . . the temporary employer exercises such control over the conduct of the employee as would make the employee his servant were it not for his general employment, the employee as to such act becomes the servant of the temporary employer."); *see also Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *6 (Tenn. Ct. App. Feb. 24, 2009) (citing *Arrow Elec. v. Adecco Employment Serv., Inc.*, 195 S.W.3d 646, 651 (Tenn. Ct. App. 2005); *Parker*, 767 S.W.2d 412, 418 (Tenn. Ct. App. 1988)) ("if an employee of one employer falls under the scope of a second employer, the liability for the employee's negligence may shift to the second employer."). The Tennessee Supreme Court adopted the Restatement of Agency view in *Gaston v. Sharpe,* 168 S.W.2d 784 (1943), and set out a test to determine whether an employee of one employer is the loaned servant of another employer:

> [A] servant at a particular time may remain under the control of his general employer for some purposes and yet be under the control of a special employer for others. Likewise it sometimes happens that a particular work in which the servant is engaged may be properly considered as the work or business of both the general employer and the special employer.
>
> The question is difficult. It is considered at some length in Restatement of Agency, § 227. We take the following from Restatement as a satisfactory rule: "Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act. This is a question of fact in each case"

*Id.* at 786. In *Armoneit v. Elliott Crane Serv., Inc.*, 65 S.W.3d 623 (Tenn. Ct. App. 2001), this court applied the loaned servant doctrine and further explained that "control is a key element" in determining whether an employer-employee relationship exists. *Id.* at 625. "In Tennessee, the right to control the result is not determinative of the existence of the relation

of master and servant, but the actual control of means and methods is." *Id.* (citing *McDonald v. Dunn Constr. Co.*, 185 S.W.2d 517, 520 (1945)).

We are not aware of any case, and none has been cited to us, in which the loaned servant doctrine has been applied to establish the employer-employee relationship required in retaliatory discharge causes of action under Tennessee common law or Tenn. Code Ann. § 50-1-304.[15]  However, we are persuaded that certain circumstances may exist in which the loaned servant doctrine could be applied to give rise to an employer-employee relationship in such cases.  Therefore, we will adapt the general test set out in *Gaston v. Sharpe* to Ms. Gager's retaliatory discharge claims to determine whether she was the loaned servant of River Park.

River Park staffed its Emergency Department with personnel employed by or provided through staffing agencies, one of which was SEP.  Ms. Gager was employed by SES and placed at River Park pursuant to the terms of her contract.  Her placement, as was that of all physicians and nurse practitioners in the River Park Emergency Department, was subject to the hospital and staff by-laws.  In addition to her compliance with the hospital and staff by-laws, Ms. Gager was required to comply with other general hospital policies, including the policy articulated by the interim CEO which  was the impetus of her lawsuit.  Thus, River Park did exert a certain amount of control over the means and methods of Ms. Gager's employment at River Park.  However, as noted above, the terms of Ms. Gager's employment were governed by her contract with SES.  Most importantly, for purposes of this case, SES retained the power to terminate Ms. Gager; River Park had no such authority.  River Park, in accordance with its contract with SEP, requested that Ms. Gager be assigned to a different facility.  Thereafter, SES exercised its right to terminate Ms. Gager rather than assign her to a different facility. As acknowledged in *Gaston*, a temporary employee may be considered the loaned servant of the special employer for some purposes and not for others.  On the facts

---

[15] The loaned servant doctrine has generally been applied in Tennessee in two distinct scenarios: (1) claims for worker's compensation, and (2) instances in which an employer who temporarily borrows and exercises control over another's employee is held to assume liability for the borrowed employee's tortious conduct. *See Arrow Elec. v. Adecco Employment Serv., Inc.*, 195 S.W.3d 646 (Tenn. Ct. App. 2005) (holding that a temporary employee was the loaned servant of employer, rather than staffing agency, and as such, employer was liable for employee's negligence in operating a forklift); *Catlett v. Indemnity Ins. Co.*, 813 S.W.2d 411 (Tenn. 1991) (finding that a borrowed employee was precluded from receiving worker's compensation from his general employer because he was the loaned servant of his temporary employer); *Parker v. Vanderbilt Univ.*, 767 S.W.2d 412 (Tenn. Ct. App. 1988) (finding Vanderbilt doctors on duty at Nashville General Hospital were the loaned servants of Nashville General Hospital for purposes of a medical malpractice action); *Richardson v. Russom Crane Rental Co.*, 43 S.W.2d 590 (Tenn. Ct. App. 1975) (holding that the crane operator was the borrowed servant of a temporary employer who directed the operation of the crane).

presented here, for purposes of her retaliatory discharge claim, Ms. Gager was not the loaned servant or employee of River Park.

Moreover, to sustain a cause of action for retaliatory discharge, Ms. Gager would have to prove River Park terminated her employment. Ms. Gager offered no proof to rebut the interim CEO's affidavit which made clear that River Park had no authority to direct the termination of SES' employees and, in fact, River Park did not terminate her. Ms. Gager's failure to point to contradictory evidence on this issue left no genuine issue of material fact to be resolved by the trier of fact.

## IV. Conclusion

Considering the evidence in the light most favorable to Ms. Gager, River Park has successfully negated essential elements of Ms. Gager's claims of retaliatory discharge, namely that she was the employee of River Park and that River Park terminated her; River Park is entitled to summary judgment as a matter of law.

Our determination that River Park is entitled to summary judgment pretermits discussion of the remaining issues, which are predicated upon a finding that valid causes of action for retaliatory discharge existed.

The judgment of the Circuit Court is affirmed.


_____
RICHARD H. DINKINS, JUDGE